In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2325

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL FLOURNOY,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 3:12-cr-50044 — **Frederick J. Kapala**, *Judge.*

ARGUED SEPTEMBER 15, 2016 — DECIDED NOVEMBER 23, 2016

Before FLAUM, MANION, and HAMILTON, *Circuit Judges*.

MANION, *Circuit Judge*. Following a jury trial, Michael Flournoy was convicted of one count of conspiring to possess cocaine and one count of attempting to possess cocaine. Flournoy appeals, claiming he is entitled to a new trial because the prosecutor made inappropriate comments during closing argument and because the government presented testimony from a cooperating witness that conflicted with that

witness's plea agreement. Flournoy also claims that the district court erred in adding several discretionary conditions to the terms of his supervised release without explanation. We affirm Flournoy's conviction, but remand for resentencing.

**I.**

In July 2012, the defendant, Michael Flournoy, met Jose Sanabria. During their first meeting, Flournoy discussed hiring Sanabria to do some construction work, but later Flournoy expressed interest in buying cocaine and heroin and offered to pay Jose a finder's fee if he found a source. A couple of days later, Jose told Flournoy that his brother, Cesar Sanabria, could help him get cocaine.

On July 27, 2012, Jose met with Flournoy and Flournoy showed Jose the money ($186,000) he intended to use to purchase the drugs. A few days later, on July 30, 2012, Jose told Flournoy that the supplier was ready and they agreed to meet at Cesar's apartment. There the three counted the buy money and Flournoy put it in the trunk of his silver Honda. Flournoy, Jose, and Cesar, along with Cesar's girlfriend, Jovita, drove from Chicago to Rockford for the planned cocaine deal. Unfortunately for them, they did not know that the supplier was an undercover officer.

That undercover officer, Bob Juanez, had started talking with Cesar about a week earlier about supplying cocaine. In a recorded conversation, Cesar and Agent Juanez discussed Cesar selling marijuana to Agent Juanez and Agent Juanez selling cocaine to Cesar. Following several more recorded calls, Cesar agreed to buy six kilograms of cocaine from Agent Juanez.

Returning to July 30, 2012: Cesar and Jovita drove to Rockford, Illinois, in a Chevrolet Tahoe. Flournoy and Jose followed in Flournoy's silver Honda. According to Cesar, the money was in the trunk of the Honda. Agent Juanez met Cesar at a Mobil gas station and then they drove to a Holiday Inn, followed by Flournoy and Jose.

At the Holiday Inn, Cesar briefly spoke with Agent Juanez inside the agent's pickup truck. Cesar then exited the truck and got in Flournoy's Honda before returning to the pickup truck. At that point, Agent Juanez called his partner, Detective Barrios, who was posing as his wife, and she drove by the pickup truck and showed Cesar an ice cooler containing what appeared to be cocaine.

In the meantime, ATF Special Agent John Richardson and Winnebago County Sheriff's Deputy Kyle Boomer were watching the drug deal go down from inside a surveillance van. Special Agent Richardson testified that he saw Flournoy go to the trunk of the silver Honda, get out a black bag and put green-wrapped bundles in the bag and then place the black bag in the back seat of the Honda. After this everyone relocated to a Wal-Mart parking lot. At this point, Flournoy exited the Honda with the black bag containing the buy money and dumped the money into the undercover agent's pickup truck. Agent Juanez then pretended to call his wife to instruct her to bring over the cocaine, but that was really the arrest signal. Officers then arrested Flournoy, Cesar, and Jose.

The government charged Flournoy, Cesar, and Jose with conspiring to possess with intent to distribute six kilograms of cocaine and attempting to possess cocaine, in violation of 21 U.S.C. § 846. That same day, from jail, Flournoy called his wife and told her to move a jack from their garage into the

alley for a scrap salvager to remove. FBI agents went to the Flournoys' home and found in the alley a drug press—a piece of hydraulic equipment used to package drugs. A DEA chemist tested the filter of the press and obtained positive results for the presence of both heroin and cocaine.

Cesar and Jose eventually both pleaded guilty to the charges. Jose testified at Flournoy's trial, but Cesar did not. During trial, Jose testified as laid out above. Of significance for this appeal, Jose testified that Flournoy had moved the black bag with the buy money from the Honda trunk to the inside of the car. However, Jose's plea agreement stated "[t]he defendant pulled out bundles of cash from the trunk of the Honda, put the cash into a duffle bag, and returned the bag to the trunk." During the Rule 11 colloquy, the prosecutor quoted that statement from the plea agreement and Jose, under oath, stated it was correct. Cesar's plea agreement similarly identified Jose as the individual who had retrieved the money from the trunk of the Honda. While the government had provided the plea agreements to Flournoy's attorney, the attorney did not cross-examine Jose on this inconsistency during Flournoy's trial.

During closing argument, Flournoy's attorney repeatedly commented upon the government's failure to call certain witnesses. For instance, his attorney argued: "Yet you sit here today never having heard a peep from Deputy Boomer, Deputy Boomer not coming in to tell you anything regarding this investigation or to support and corroborate what Agent Richardson said. Just gone. Not brought in." He continued: "You have to see and ask whether or not that witness is somebody that should be brought in, somebody that you should hear from to support." Later his attorney stressed this point again,

stating: "The government had the job to present you with all of the relevant evidence, and they failed to do that. The[y] failed to do that from bringing forth officers that were leading the investigation."

In its closing argument, the prosecutor responded by stating: "Now, the government has the burden, but ladies and gentlemen, the defense can call witnesses too, if they want." Flournoy's attorney objected, stating that "a defendant has an absolute right not to testify or present evidence." Following arguments outside the jury's presence, the district court overruled the objection. After the jury returned, the district court read the following instruction to the jury, "A defendant has an absolute right not to testify or present evidence. You may not consider in any way the fact that the defendant did not testify or present evidence. You should not even discuss it in your deliberations."

The prosecutor then returned to its closing argument, stating:

> As I indicated, the burden is on the United States. We accept that burden. The defense has no, no obligation to present testimony in any form. However, they do have the same subpoena powers as the United States, and if they wanted to subpoena in and to have testify surveillance agents, telephone records person, or anybody else, they could have done that if they had wanted to, if they had thought it would have been appropriate or helpful. Granted, they don't have the burden to do so, but they do have the power to do so.

Without objection, the prosecutor also stated:

> Ladies and gentlemen, you're here as a jury be-
> cause we don't try people based upon hiding the ball.
> We try people based upon the facts. Not what ifs, not
> maybes, not could-have-beens. The United States
> would not bring a case based upon that because it
> wouldn't work. We bring cases built upon facts, facts
> adduced by testimony and by witnesses and by exhib-
> its, and that's what you need to focus on.

Following deliberations, a jury convicted Flournoy on all
counts. The district court then sentenced him to 204 months'
imprisonment, followed by concurrent terms of five years' su-
pervised release. In addition to the mandatory conditions of
supervised release, the district court imposed several addi-
tional discretionary conditions of release. Flournoy filed a
motion for a new trial, arguing the evidence was insufficient
to support his conviction, that the government's closing argu-
ment was improper, and that the government knowingly
used perjured testimony. The district court denied the motion
for a new trial. Flournoy appeals.

## II.

### A. Motion for a New Trial

On appeal, Flournoy argues that the district court erred in
denying his motion for a new trial under Federal Rule of
Criminal Procedure 33. That rule provides that a trial court
"may vacate any judgment and grant a new trial if the interest
of justice so requires." Fed. R. Crim. P. 33(a). This court re-
views a district court's denial of a motion for a new trial under
Rule 33 for an abuse of discretion. *United States v. Kuzniar*, 881
F.2d 466, 470 (7th Cir. 1989).

In support of his argument that he is entitled to a new trial, Flournoy asserts first that prosecutorial misconduct deprived him of his due process rights to a fair trial. When considering allegations of prosecutorial misconduct, this court first determines whether the prosecutor's conduct was improper, and, if so, we must evaluate the conduct "in light of the entire record" to determine if it deprived the defendant of a fair trial. *United States v. Smith*, 674 F.3d 722, 728 (7th Cir. 2012).

Flournoy's claim of prosecutorial misconduct focuses on two comments made by the government during closing argument. First, he maintains the prosecutor engaged in misconduct by highlighting that Flournoy could call witnesses to testify. Flournoy argues that this line of argument wrongly shifted the burden of proof to Flournoy.

This argument is misplaced. "[A]s long as it is clear to jurors that the government carries the burden of proof, the prosecutor may tell the jury that a defendant has the power to subpoena witnesses." *United States v. Miller*, 276 F.3d 370, 374–75 (7th Cir. 2002). In this case, the prosecutor explicitly stated twice that the government bore the burden of proving Flournoy's guilt. The prosecutor also stressed that "defense has no, no obligation to present testimony in any form." Further, in the midst of the government's closing argument, the district court interjected and instructed the jury: "A defendant has an absolute right not to testify or present evidence. You may not consider in any way the fact that the defendant did not testify or present evidence. You should not even discuss it in your deliberations." "We presume that juries follow instructions." *Id.* at 375. Further, "[i]n a case like this where the defendant himself has broached the subject of missing wit-

nesses by asking the jury to in a sense penalize the government for its failure to produce the agents, the prosecutor's argument in response clearly was proper." *United States v. King*, 150 F.3d 644, 649 (7th Cir. 1998). Given the totality of these circumstances, we conclude that the district court did not abuse its discretion in allowing the prosecutor's argument.

Flournoy also claims the prosecutor engaged in misconduct by improperly vouching for its witnesses by stating:

> [W]e don't try people based upon hiding the ball. We try people based upon the facts. Not what ifs, not maybes, not could have beens. The United States would not bring a case based upon that because it wouldn't work. We bring cases built upon facts, facts adduced by testimony and by witnesses and by exhibits, and that's what you need to focus on.

Flournoy did not object to this argument, so his claim of prosecutorial misconduct is reviewed for plain error. *Id.* at 869–70. To establish plain error, Flournoy must show the improper vouching was "obvious, affected the defendant's substantial rights to such an extent that he would not otherwise have been convicted, and seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Alexander*, 741 F.3d 866, 869 (7th Cir. 2014). As we explained in *Alexander*, "[t]hat is a lengthy way of saying that we will not grant [the defendant] a new trial unless there was an error so egregious that the district judge should have stepped in even though no objection was made." *Id.* at 870 (footnote omitted).

"We have recognized two types of impermissible vouching: 'a prosecutor may not express her personal belief in the

truthfulness of a witness, and a prosecutor may not imply that facts not before the jury lend a witness credibility.'" *United States v. Wolfe*, 701 F.3d 1206, 1212 (7th Cir. 2012) (quoting *United States v. Alviar*, 573 F.3d 526, 542 (7th Cir. 2009)). Flournoy does not explain exactly how the prosecutor's comments constitute improper vouching, but he seems to be saying that the prosecutor's comment concern facts not presented to the jury. Arguably, the government's comments could be viewed as vouching for facts not presented to the jury—that the government had a practice of only prosecuting cases where sufficient evidence exists. But here the prosecutor immediately followed the comments by stressing that the "facts [are] adduced by testimony and by witnesses and by exhibits, and that's what you need to focus on." Thus, in context, the prosecutor's argument is more properly viewed as a comment on the facts the government presented at trial. At most, then, the prosecutor's argument edges toward borderline inappropriate, but surely not one "so egregious that the district judge should have stepped in even though no objection was made." *Alexander*, 741 F.3d at 870; *see also id.* at 871 ("[T]he fact that the line is so fine … emphasizes the need for a timely objection."). Accordingly, there was no plain error in the prosecutor's closing argument.

Finally, Flournoy claims he is entitled to a new trial because Jose's testimony conflicted with the facts to which Jose admitted earlier in pleading guilty. Specifically, at Flournoy's trial Jose testified that on the night of the drug deal Flournoy went to the trunk of the Honda and removed a bag containing the buy money, placing the bag inside the car. Conversely, Jose's plea agreement stated that Jose removed the money from the trunk of the car. Cesar's plea agreement likewise identified Jose as the individual responsible for moving the

buy money from the trunk into the back of the Honda. And in pleading guilty, Jose and Cesar admitted to the conduct set forth in the plea agreement.

Initially we note that on appeal Flournoy does *not* claim that Jose testified falsely at his trial; rather, Flournoy argues that the government violated his due process rights by presenting inconsistent theories of guilt at his trial and in the cases presented against his co-defendants, Jose and Cesar, who pleaded guilty. While this court has noted that the circuits are split on whether such conduct violates the Due Process Clause, this court has not yet taken a position on the issue. *United States v. Presbitero*, 569 F.3d 691, 702 (7th Cir. 2009). *See also Bradshaw v. Stumpf*, 545 U.S. 175, 190 (2005) (Thomas, J., concurring) ("This Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories."). We need not do so today either because, even if this theory were viable, Flournoy would not be entitled to a new trial.

A defendant is entitled to a new trial only if there is a reasonable possibility that the trial error had a prejudicial effect on the jury's verdict. *United States v. Berry*, 92 F.3d 597, 600 (7th Cir. 1996). There is no such possibility in this case. First, there is no indication that Jose's testimony at Flournoy's trial was false, as opposed to the language in the plea agreements. That was the government's position below when it explained the discrepancy to the district court: the prosecutor explained that it had drafted Flournoy's plea agreement first, believing he would be the one to plead guilty, and then used that plea agreement as a template for Jose and Cesar's plea agreements. However, in doing so, the government failed to change the language to identify Flournoy as the individual who moved

the drugs from the trunk to the back of the car.[1]At best, then, the conflict could be used to impeach Jose's testimony. Flournoy's attorney, however, did not impeach Jose on this basis even though the government had provided Jose and Cesar's plea agreements. It is unclear whether that was a strategic decision (his attorney did not want to highlight Jose and the other agent's testimony), or whether his attorney did not notice the discrepancy. But either way, it does not translate into a Due Process violation. Further, there is no possibility that impeaching Jose based on his prior guilty plea would have a prejudicial effect on the jury's verdict. At trial, Agent Richardson testified that while conducting surveillance, he saw Flournoy get out of his car, look around, go to the trunk, look around again, open the trunk, and then put some green-wrapped bundles into the black bag. And it is undisputed that Flournoy is the individual who dumped the buy money from the black bag into Agent Juanez's pickup truck. The other evidence presented was also overwhelming. Beyond the testimony of his co-conspirators that clearly identified Flournoy as the buyer, other evidence established that: Flournoy was the person who drove the car that had nearly $200,000 in cash; when Agent Juanez wanted to see the money, it was Flournoy who took the money from the car and brought it to Agent Juanez's truck; and after his arrest, Flournoy called his wife instructing her to move the drug press (which tested positive

---

[1]The government notes that at all other times during the proceedings against Flournoy, it took the position that Flournoy—and not Jose—had removed the buy money from the trunk, pointing to the criminal complaint, the government's response to the defendant's motion to suppress, and the government's post-evidentiary hearing memorandum regarding the defendant's motion to suppress.

for cocaine and heroin residue) from their garage to the alley. Given the totality of the evidence, there is no reasonable possibility that there was a prejudicial effect on the jury's verdict. Accordingly, the district court did not abuse its discretion in denying Flournoy a new trial.

### B. Supervised Release

Flournoy also argues on appeal that the district court erred in sentencing him to a five-year term of supervised release that included discretionary conditions of release, because the district court did not explain its rationale for imposing those terms. This court has held that it is reversible error for a district court to impose discretionary conditions of supervised release without considering the sentencing factors set forth in 18 U.S.C. § 3583(d) and 18 U.S.C. § 3553(a), and without stating the reasons for selecting the specific conditions imposed. *United States v. Thompson*, 777 F.3d 368, 377–78 (7th Cir. 2015). The government concedes the error and that remand for resentencing is appropriate. That was our holding in *Thompson* (which was not yet decided at the time of Flournoy's sentencing). Accordingly, we remand for resentencing.

### III.

A jury heard extensive evidence establishing that Flournoy conspired with Cesar and Jose Sanabria to possess six kilograms of cocaine with the intent to distribute, and attempted to possess with intent to distribute the cocaine. While in pleading guilty, Jose indicated that he—and not Flournoy—had removed the buy money from the trunk of the Honda, there was no evidence that Jose lied during his testimony at Flournoy's trial. Nor is there a reasonable probability

that the discrepancy affected the jury verdict. The prosecutor's comments during closing argument also were not improper. To the extent one may have been borderline impermissible vouching, it did not impact the outcome of the trial. Accordingly, the district court did not abuse its discretion in denying Flournoy's motion for a new trial and we AFFIRM Flournoy's conviction. However, the district court did not articulate its reasons for imposing discretionary conditions of supervised release. Therefore, we REMAND for resentencing.